UNITED STATES v. HOLMES et ux.

(Circuit Court, S. D. California. October 29, 1900.)

No. 842.

1. UNITED STATES—RIGHT TO CIVIL REMEDIES—ACTIONS.
   The government of the United States is entitled, for the protection of its property, and without express legislative authority, to all civil remedies given to individuals in its courts.

2. PUBLIC LANDS—RIGHTS OF SETTLER.
   Mere occupation and improvement of public lands with a view to the acquisition of title thereto under the land laws does not confer upon the settler any rights therein as against the United States, or impair in any respect the power of congress to dispose of the land in any way it may deem proper.

3. SAME—EXCEPTIONS FROM FOREST RESERVATION—LAND OCCUPIED BY SETTLERS.
   A provision in a proclamation by the president creating a forest reservation under Act March 3, 1891, § 24 (26 Stat. 1103), excepting from the effect of such proclamation all lands "upon which any valid settlement has been made pursuant to law," does not apply to land which, prior to the time it was settled upon, had been withdrawn from entry and settlement by the land department as within the limits of a railroad grant, and had not thereafter been restored to the public domain for settlement; and it is immaterial that the lands were not in fact within the grant, and their withdrawal was made through an error in its construction by the department.

4. SAME—ACT FOR BENEFIT OF SETTLERS ON RAILROAD LANDS—CONSTRUCTION.
   The provision of Act Jan. 13, 1881 (21 Stat. 315), giving all persons who had settled upon and improved any odd-numbered section of land within a railroad withdrawal with the permission of the railroad company, and the intention of purchasing the same, the right to purchase not exceeding 160 acres of the same from the United States if for any cause it should be restored to the public domain, does not apply to a tract of land which, although erroneously withdrawn from settlement, was not restored to the public domain, but was devoted by congress to another use.

5. SAME—PURCHASERS OF RAILROAD LANDS.
   A mere license given by a railroad company to settle upon a tract of land supposed to be within a grant made by congress to such company, where the company expressly declined to enter into a contract of sale, does not constitute the settler a purchaser, within the meaning of Act March 3, 1887, § 5 (24 Stat. 557), which gives to bona fide purchasers of such lands the right to purchase the same from the United States, where, for any reason, they are excepted from the operation of the grant.

Action of Ejectment.

The defendants Albert O. Holmes and Susan L. Holmes, his wife, have filed separate answers, each claiming the land in controversy. Both deny ouster and that the defendants were in possession wrongfully, etc. The defendant Albert O. Holmes avers: That he is a citizen of the United States, over the age of 21 years, not the proprietor of more than 160 acres of land in any state or territory of the United States, and that he has not heretofore had the benefit of the homestead laws of the United States. That in April, 1890, he settled upon the land in controversy in good faith to obtain a home for himself, and with the intention of claiming the same under the homestead laws of the United States. That said land is, and was at all the times herein mentioned, unsurveyed public land, and is still unsurveyed, and no plat of the township embracing the land is yet upon file, or has been received at the district land office of the district wherein the land is situated. That at the date of his said settlement said land was unappropriated public land, but had been withdrawn from entry by the United States land department as being within the limits of the grant made by the congress of the United States to the

Southern Pacific Railroad Company by the act of March 3, 1871, and parties seeking to acquire said lands were not permitted to file thereon under the provisions of the laws of the United States relating to public lands. That otherwise, and but for said withdrawal, the said land was at the date of said settlement subject to pre-emption under the laws of the United States. That within six months after his settlement he established his actual residence in a house upon said land, and has ever since resided thereon, and cultivated and farmed said land continuously, and made it the home of himself and his family. That he is now, and at all times since his said settlement has been, in the quiet and peaceable possession of said land; and that it is his intention, as soon as said land is surveyed, and an approved plat of the township embracing the same is received at the district land office of the United States, to file his homestead application for said land, and thereafter to perfect his original entry thereon under and in pursuance of the act entitled "An act for the relief of settlers on the public lands," approved May 14, 1880. The defendant Susan L. Holmes, in her separate answer, avers that she is the wife of the defendant Albert O. Holmes, and not divorced from nor deserted by her said husband; that in April, 1890, she settled and made valuable and permanent improvements on the land in controversy, with the permission and license of the Southern Pacific Railroad Company, in good faith, and with the expectation of purchasing of said company said land, and has since continuously resided thereon, and been in the quiet and peaceable possession thereof. She claims to be entitled to acquire said land under two separate acts of congress, hereinafter mentioned, to wit: (1) "An act for the relief of certain settlers on restored railroad lands," approved January 13, 1881 (21 Stat. 315); (2) "An act to provide for the adjustment of land grants made by congress to aid in the construction of railroads, and for the forfeiture of unearned land, and for other purposes," approved March 3, 1887 (24 Stat. 557). Among the material facts are these: The land sued for was, at the date of defendants' settlements, herein mentioned, public land of the United States, but had been withdrawn from entry by the land department as being within the limits of the grant made to the Southern Pacific Railroad Company by the act of congress of March 3, 1871 (16 Stat. 579), and was also within the overlapping limits of the grant made to the Atlantic & Pacific Railroad Company by the act of July 27, 1866 (14 Stat. 292). The Atlantic & Pacific Railroad Company built part of its road east of the Colorado river, but did not construct any line west of that river, or in California. In consequence of such failure, congress, by the act of July 6, 1886 (24 Stat. 123), forfeited and restored said lands to the public domain. Prior to said last-mentioned act, they had been withdrawn from entry upon the assumption that they were included in the subsequent grant made to the Southern Pacific Railroad Company of March 3, 1871, and said withdrawal was continued in force after the said forfeiting act of 1886. While the condition of affairs was such as above indicated, the defendant Susan L. Holmes made the application to purchase set forth in the opinion of the court. About the year 1892 suits were brought by the government of the United States against the Southern Pacific Railroad Company to determine the status of the lands within said overlapping limits, and the supreme court ultimately declared in favor of the government, as shown by the following extract from its opinion: "The supreme court of the United States distinctly declared that the lands within the overlapping limits became, upon the passage of the forfeiture act of 1886, the property of the United States, and by force of that act were restored to the public domain, without the Southern Pacific R. R. Co. having acquired any interest therein. * * * It is further declared that by the act of forfeiture of 1886 the title to the A. & P. R. R. Co. was retaken by the general government, and retaken for its benefit, and not that of the S. P. R. R. Co., and that the latter company has no title of any kind to these lands." Southern Pac. R. Co. v. U. S., 168 U. S. 66, 18 Sup. Ct. 18, 42 L. Ed. 355. The defendant Albert O. Holmes, in April, 1890, settled upon the land in controversy for the purpose of acquiring the same under the homestead laws of the United States. Within six months after said settlement he established, and has since continuously maintained, his residence on said land, making it the home of himself and his family. Defendants, during their occupancy of said lands, have made valuable and perma-

nent improvements thereon. Defendant Albert O. Holmes intends, as soon as the land is surveyed, to file a homestead application therefor in the land office. Mrs. Holmes has made application to the land department to purchase said lands under the act of congress approved March 3, 1887, hereinafter quoted from, which application is pending in the land office. Under the rules of said office, no filing or other application to acquire public lands under the act of January 13, 1881, will be received or considered until the lands have been surveyed, and because of that rule Mrs. Holmes has filed no application to purchase as a settler under said act. For a like reason defendant Albert O. Holmes has not filed his homestead application under the act of May 14, 1880. Both defendants, however, intend, respectively, as soon as they can do so, to make and prosecute the applications above indicated. The other material facts are stated in the opinion of the court.

Frank P. Flint, U. S. Atty., and J. R. Finlayson, Asst. U. S. Atty.

Sheldon Borden and D. M. McDonald, for defendants.

WELLBORN, District Judge (after stating the facts as above). An elaborate discussion of all the questions argued in the briefs of the respective parties is impracticable, and I shall undertake in this opinion but little more than an intelligible statement of my conclusions.

1. There seems to me no room for reasonable controversy but that the government of the United States, for the protection of its property, is entitled, without express legislative authority, to the civil remedies ordinarily administered in its courts. On this point the supreme court of the United States has said:

"It would present a strange anomoly, indeed, if, having the power to make contracts and hold property as other persons, natural or artificial, they were not entitled to the same remedies for their protection. The restraints of the constitution upon their sovereign powers cannot affect their civil rights. Although, as a sovereign, the United States may not be sued, yet as a corporation, or body politic, they may bring suits to enforce their contracts and protect their property in the state courts, or in their own tribunals administering the same laws. As an owner of property in almost every state of the Union, they have the same right to have it protected by the local laws that other persons have. As was said by this court in Dugan v. U. S., 3 Wheat. 181, 4 L. Ed. 361, 'It would be strange to deny them a right which is secured to every citizen of the United States.' In U. S. v. Bank of Metropolis, 15 Pet. 392, 10 L. Ed. 774, it was declared that when the United States, by their authorized agents, become a party to negotiable paper, they have all the rights and incur all the responsibilities of other persons who are parties to such instruments. In U. S. v. Gear, 3 How. 120, 11 L. Ed. 523, the right of the United States to maintain an action of trespass for taking ore from their lead mines was not questioned." Cotton v. U. S., 11 How. 229, 13 L. Ed. 675.

To the same effect, I quote from the brief of the district attorney, filed in this case, the following citations:

"The opinion of Attorney General Wirt, of date May 27, 1821, holds as follows: 'Independent of positive legislative provisions, I apprehend that, in relation to all property, real or personal, which the United States are authorized by the constitution to hold, they have all the civil remedies, whether for the prevention or redress of injuries, which individuals possess. See 3 Wheat. 181, 4 L. Ed. 364. So the United States, being authorized to accept and to hold these lands for the common good, must have all the legal means of protecting the property thus confided to them that individuals enjoy in like cases. * * * They are, therefore, in my opinion, entitled to the injunction of waste by way of prevention, and to the action of trespass by way of punishment, in like manner as individuals similarly situated are entitled to them.' Attorney General Taney, afterwards chief justice of the United

States, in an opinion of 22d of August, 1833, cites this opinion of Mr. Wirt, and concurs in it."

No law of congress touching the disposition of the public lands by the government has been called to my attention, nor do I believe that any exists, which changes the rule declared in the citations above given, or abridges in any way the power of the courts to hear and determine actions brought by the government of the United States for the preservation and protection of the public domain. My conclusion on this branch of the case is that this court has jurisdiction of the pending cause.

2. "The United States, by pre-emption laws, do not enter into any contract with the settler, nor incur any obligation that the land occupied by him shall ever be put up for sale. They simply declare by those laws that, in case any of their lands are thrown open for sale, the privilege to purchase them in limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them. The legislation thus adopted for the benefit of settlers was not intended to deprive congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use." Third paragraph of the syllabus in Hutchings v. Low, 15 Wall. 77, 21 L. Ed. 82. In the body of the opinion of the case above cited the supreme court say:

"The question here presented was before this court, and was carefully considered, in the case of Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668, and it was there held that under the pre-emption laws mere occupation and improvement of any portion of the public lands of the United States, with a view to pre-emption, do not confer upon the settler any right in the land occupied, as against the United States, or impair in any respect the power of congress to dispose of the land in any way it may deem proper; and that the power of regulation and disposition conferred upon congress by the constitution only ceases when all the preliminary acts prescribed by those laws for the acquisition of the title, including the payment of the price of the land, have been performed by the settler. When these prerequisites have been complied with, the settler for the first time acquires a vested interest in the premises occupied by him, of which he cannot be subsequently deprived. He is then entitled to a certificate of entry from the local land officers, and ultimately to a patent for the land from the United States. Until such payment and entry, the acts of congress give to the settler only a privilege of pre-emption in case the lands are offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others. The United States, by those acts, enter into no contract with the settler, and incur no obligation to any one, that the land occupied by him shall ever be put up for sale. They simply declare that, in case any of their lands are thrown open for sale, the privilege to purchase them in limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them. The legislation thus adopted for the benefit of settlers was not intended to deprive congress of the power to make any other disposition of the lands before they are offered for sale, or to appropriate them to any public use."

See, also, Campbell v. Wade, 132 U. S. 34, 10 Sup. Ct. 9, 33 L. Ed. 240; Frisbie v. Whitney, 9 Wall. 189, 19 L. Ed. 668.

The next inquiry is, has congress devoted these lands to any use inconsistent with their acquisition by the defendants? Section 24 of the act of congress approved March 3, 1891, entitled "An act to repeal timber culture laws, and for other purposes" (26 Stat. 1103), provides:

"That the president of the United States may, from time to time, set apart and reserve, in any state or territory having public lands bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the president shall, by public proclamation, declare the establishment of such reservations and the limits thereof."

Pursuant to the act of congress last cited, the president of the United States, on the 20th day of December, 1892, duly issued a public proclamation, wherein he "reserved from entry or settlement and set apart as a public reservation" a certain part of the public domain, specifically described, and which includes the lands in controversy in this suit, excepting, however, from the force and effect of said proclamation "all lands which may have been, prior to the date hereof, embraced in any legal entry or covered by any lawful filing duly of record in the proper United States land office, or upon which any valid settlement has been made pursuant to law, and the statutory period within which to make entry or filing of record has not expired, and all mining claims duly located and held according to the laws of the United States and rules and regulations not in conflict therewith: provided, that this exception shall not continue to apply to any particular tract of land unless the entryman, settler or claimant continues to comply with the law under which the entry, filing, settlement or location was made." 27 Stat. 1051. Do the defendants fall within any one of the classes mentioned in said exception? It is not claimed that there has been any legal entry or lawful filing, duly of record in the proper United States land office, but the defendant Albert O. Holmes contends that he is within the scope of that clause which protects valid settlements made pursuant to law. This contention, in my opinion, is vulnerable, for the reason that at the time said Holmes made his settlement the lands were withdrawn from entry and settlement. Maddox v. Burnham, 156 U. S. 544, 15 Sup. Ct. 448, 39 L. Ed. 527; Wood v. Beach, 156 U. S. 547, 15 Sup. Ct. 410, 39 L. Ed. 528. Nor does it in any way impair the soundness of this conclusion that the withdrawal of said lands was made under an erroneous impression that they were embraced within a valid grant to the Southern Pacific Railroad Company. In Wood v. Beach, supra, the court says (italics being mine):

"It was said in Wolsey v. Chapman, 101 U. S. 755, 768, 25 L. Ed. 915, 920: 'The proper executive department of the government had determined that, because of doubts about the extent and operation of that act, nothing should be done to impair the rights of the state above the Raccoon Fork until the differences were settled, either by congress or judicial decision. For that purpose an authoritative order was issued, directing the local land officers to withhold the lands from private entry; and, as we held in Riley v. Welles, 19 L. Ed. 648, was sufficient to defeat a settlement for the purpose of preemption while the order was in force, *notwithstanding it was afterwards found that the law, by reason of which this action was taken, did not contemplate such a withdrawal.*'"

The numerous cases cited in defendants' brief to the effect that a settler going on unsurveyed lands with the bona fide intention of acquiring the same goes by invitation of the government, etc., have no application to the case at bar. Surely, it cannot be successfully maintained that the government, at the time defendants entered

upon the land in controversy, invited them to do so, in the face of the conceded fact that such lands were then withdrawn from entry. From the foregoing it follows that the defendant Albert O. Holmes cannot hold the land in controversy against the government's demand for its possession.

I now pass to the consideration of the defenses set up by the defendant Susan L. Holmes. The first act of congress under which she claims a possessory right to the land is that of January 13, 1881, and is as follows:

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that all persons who shall have settled and made valuable and permanent improvements upon any odd numbered section of land within any railroad withdrawal in good faith and with the permission or license of the railroad company for whose benefit the same shall have been made, and with the expectation of purchasing of such company the land so settled upon, which land so settled upon and improved may, for any cause, be restored to the public domain, and who, at the time of such restoration, may not be entitled to enter and acquire title to such land under the pre-emption, homestead, or timber-culture laws of the United States, shall be permitted, at any time within three months after such restoration, and under such rules and regulations as the commissioner of the general land office may prescribe, to purchase not to exceed one hundred and sixty acres in extent of the same by legal sub-divisions, at the price of two dollars and fifty cents per acre, and to receive patents therefor." 21 Stat. 315.

With reference to this defense it need only be said that the land in controversy has not been restored to the public domain, but, on the contrary, has been devoted to another use, which is seemingly permanent, so that the contingency on which Mrs. Holmes would be entitled to purchase the land, namely, its restoration to the public domain, will never arise. The possessory right claimed cannot be founded upon such an uncertain, not to say impossible, contingency.

The defendant Susan L. Holmes makes another defense, based upon section 5 of the act of congress of March 3, 1887, entitled "An act to provide for the adjustment of land grants made by congress to aid in the construction of railroads and for the forfeiture of unearned lands, and for other purposes," which section is as follows:

"Sec. 5. That where any said company shall have sold to citizens of the United States, or to persons who have declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the bona fide purchaser thereof from said company to make payment to the United States for said lands at the ordinary government price for like lands, and thereupon patents shall issue therefor to the said bona fide purchaser, his heirs or assigns: provided, that all lands shall be excepted from the provisions of this section which at the date of such sales were in the bona fide occupation of adverse claimants under the pre-emption or homestead laws of the United States, and whose claims and occupation have not since been voluntarily abandoned, as to which excepted lands the said pre-emption and homestead claimants shall be permitted to perfect their proofs and entries and receive patents therefor: provided further, that this section shall not apply to lands settled upon subsequent to the first day of December, eighteen hundred and eighty-two, by persons claiming to enter the same under the settlement laws of the United States, as to which lands the parties claiming the same as aforesaid shall be entitled to prove up and enter as in other like cases." 24 Stat. 557.

It will be observed that the persons protected by said section are those to whom the railroad company has "sold" lands. Can it be said, under the evidence adduced by the defendant Mrs. Holmes, that the railroad company sold to her the land in controversy? It is true that the company consented to her occupancy of said land, but it is also true that the company declined to bind itself to a sale. The only negotiations had between said defendant and said company consisted of an application by the former to purchase and the acknowledgment of its receipt by the land agent of the company. The application is in the words and figures following, to wit:

"Application.

"Southern Pacific Railroad Co. Land Department.

"July 8th, 1891.

"I, S. L. Holmes, wish to purchase the land on which I reside, supposed to be S. E. quar. of section 7, township four (4) north, range nine (9) west, San Bernardino base and meridian, in Los Angeles county, California, containing one hundred sixty (160) acres. This application is made with the understanding that it confers no right or privilege; that if there be two or more applicants for the same tract of land, the actual settler who in equity is best entitled to purchase will be given the preference; that the S. P. R. R. Company reserves to itself the right, if it so elects, not to sell the above land in the shape designated, or by itself, but to sell it in conjunction with other of its lands; and that the determination of the questions mentioned herein—that is, of equity, awarding privilege of purchase to the applicant or applicants, and deciding whether or not the company will sell the above land in the shape applied for, or by itself, or in connection with other of its lands—shall be entirely left to and be within the judgment and discretion of the company's land agent; and his decision on such questions shall be final and conclusive.

"S. L. Holmes.

"Residence: Big Rock Creek.

"P. O. Address: Harold, Los Angeles Co., California.

"To Jerome Madden, Land Agent S. P. R. R. Co., San Francisco, Cal."

Indorsed:

"S. P. R. R. Application to purchase S. E. ¼ of Sec. 7, T. 4 N., R. 9 W., S. B. base and meridian, by S. L. Holmes. P. O. Address: Harold, Cal. July 8th, 1891.

"Land Dep't S. P. R. R. Co. Received Jul. 14, 1891. Answered July 16, 1891, by receipt to address hereon.

"U. S. A. vs. Holmes. Exhibit E."

The response to said application was as follows:

"Jerome Madden, Land Agent.

"Note. Be careful in writing about land to describe it particularly by section or parts of section, township, and range.

Land Department of the Southern Pacific Railroad Company. Fourth and Townsend Sts.

"Exhibit A.

"San Francisco, California, July 16th, 1891.

"Mrs. S. L. Holmes, Harold, Cal.—Sir: Your application for S. E. ¼ of Sec. 7, T. 4 N., R. 9 W., S. B. B. & M., dated July 8th, 1891, has been received and filed in this office. This receipt for the application above mentioned is given with the understanding that said application confers no right or privilege; that, if there be two or more applications for the same tract of land, the actual settler who in equity is best entitled to purchase will be given the preference; that the S. P. R. R. Co. reserves to itself the right, if it so elects, not to sell the above land in the shape designated, or by itself, but to sell it

in conjunction with other of its lands, and that the determination of the questions mentioned herein—that is, of equity, awarding privilege of purchase to the applicant or applicants, and deciding whether or not the company will sell the above land in the shape applied for, or by itself, or in connection with other of its lands—shall be entirely left to and be within the judgment and discretion of the company's land agent, whose decision on such question shall be final and conclusive.

"Respectfully, Jerome Madden, Land Agent S. P. R. R. Co.

"Owing to change of residence, persons often fail to get notice when land is for sale. If you change your P. O. address, return this certificate with the new address noted on it.

"P. O. address changed to ———."

From these communications it will be seen that the company, so far from selling the land to said defendant, expressly declined to enter at that time into any contract for the sale of said lands. I have examined carefully the precedents cited by defendant on this branch of the case (U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 17 Sup. Ct. 368, 41 L. Ed. 789, and Same v. Southern Pac. R. Co. [C. C.] 88 Fed. 832), and I fail to find in either of them anything to support the contention that defendant is a "bona fide purchaser." On the contrary, both cases proceed upon the theory that, before there can be a bona fide purchaser, there must be a contract of sale binding upon the parties. In the former—U. S. v. Winona & St. P. R. Co., supra—the supreme court, in discussing section 4 of the act of congress now under consideration, says:

"It will be observed that the technical term 'bona fide purchaser' is not found in this section, and, while it is provided that a mortgage or pledge shall not be considered a sale so as to entitle the mortgagee or pledgee to the benefit of the act, it does secure to every one who in good faith has made an absolute purchase from a railroad company protection to his title irrespective of any errors or mistakes in the certification or patent."

Further on, and discussing section 5 of the same act,—the one upon which the defense is rested in the case at bar,—the court says:

"It is true, the term used here is 'bona fide purchaser,' but it is a bona fide purchaser from the company; and the description given of the lands, as not conveyed and 'for any reason excepted from the operation of the grant,' indicates that the fact of notice of defect of title was not to be considered fatal to the right. Congress attempted to protect an honest transaction between a purchaser and a railroad company, even in the absence of a certification or patent. These being the provisions of the act of 1887, the act of 1896, confirming the right and title of a bona fide purchaser, and providing that the patent to his lands should not be vacated or annulled, must be held to include one who, if not in the fullest sense a 'bona fide purchaser,' has nevertheless purchased in good faith from the railroad company."

The court then, on the page last quoted, summarizes its views as follows:

"Our conclusion is that these acts operate to confirm the title to every purchaser from a railroad company of lands certified or patented to or for its benefit, notwithstanding any mere errors or irregularities in the proceedings of the land department, and notwithstanding the fact that the lands so certified or patented were, by the true construction of the land grants, although within the limits of the grants, excepted from their operation, providing that he purchased in good faith, paid value for the lands, and providing, also, that the lands were public lands in the statutory sense of the term, and free from individual or other claims."

Thus it will be seen that, while the court holds that absence of notice is not essential to a bona fide purchaser, within the meaning of the act in question, yet nowhere in the opinion can there be found any intimation whatever that there can be a bona fide purchaser without a sale or purchase, while the contrary view—that there must be a sale or purchase, binding upon the parties, before there can be a bona fide purchaser—is kept prominent throughout the whole opinion. The contention of said defendant that she is a bona fide purchaser, within the meaning of said section, I think, is untenable.

Referring to subdivision 14 of defendants' opening brief, I would say that I am not unmindful of what are there called the "humanities of this case," and to which my attention is specially invited, namely, the hardships which defendants will suffer by reason of their ejectment from the lands sued for; but due consideration of the law of the case forces me to the conclusion that neither of them has a possessory right to said lands, and that the government has not, either through its legislative or executive department, done anything which bars a recovery in this action. Judgment will be entered for the plaintiff.