[No. 1602.]

JACOB SPRINGER, RESPONDENT, *v.* THOMAS CLO-
PATH, APPELLANT.

PUBLIC LAND—OCCUPANCY—WHEN LISTED TO STATE—APPROPRIATION—PUR-
CHASE FROM STATE—TITLE. Mere occupancy of land at the time it was
listed to the state under act of Congress, June 16, 1880, which granted
lands from unappropriated lands, did not constitute an appropriation,
so as to render the listing to the state invalid, and give the occupant
title as against a subsequent purchaser from the state.

APPEAL from the Second Judicial District Court, Washoe
County; *B. F. Curler*, Judge.

Suit to quiet title by Jacob Springer against Thomas Clo-
path. From a judgment in favor of plaintiff, and order
denying defendant's motion for new trial, defendant appeals.
**Reversed.**

The facts sufficiently appear in the opinion.

*Torreyson & Summerfield*, for Appellant:

I. It is admitted that plaintiff only claims title to this
land by right of possession and occupancy; that he has no
record title to said land; that he has in no way connected

himself with the government title; that he never made or has made any application to the United States Land Office to preempt or homestead said land; that he has never made any application to purchase the same from the State of Nevada. Counsel for plaintiff claims that this land being in the possession and occupancy of plaintiff, and a portion of it improved and cultivated by him when the State of Nevada made application to select the same, that it was not of the character of land which the state was entitled to select under the act of June 15, 1880; that it was not at the date of selection "unappropriated, non-mineral public land." That under the act of March 5, 1887, the land was in the "actual adverse possession of another" at the date of the application of the state. (Stats. 1887, 124; Comp. Laws, 325.)

II. Defendant claims: (*a*) That mere occupancy and improvement of the public lands, no matter how long continued, gives no title as against the United States or its grantee; (*b*) That the statute of limitations has no application to the title of a patentee of the United States anterior to the issuance of the patent; (*c*) That the patent from the United States to the State of Nevada, and from the State of Nevada to defendant's grantor cannot be set aside in a collateral proceeding. It can only be set aside in a direct proceeding by the United States for some fraud or mistake; (*d*) That the possession claimed by plaintiff is not such a possession as the law requires and therefore the land was "unappropriated, non-mineral public land" such as the state was entitled to select; (*e*) That the land department of the government investigates and determines the character of the land—whether "unappropriated, non-mineral public land"—and if these officers have been imposed upon the government will step in and correct the error.

III. Occupation and priority of possession are utterly worthless when opposed to a title, or right of possession expressly conferred by the proper federal authorities. (*Courchaine* v. *Bullion M. Co.*, 4 Nev. 369–374.) It has been often held that mere occupancy and improvement of the public lands, no matter how long continued, gives no vested right in such lands as against the United States or any purchaser from them. (*Sparks* v. *Pierce*, 115 U. S. 408; *Oaksmith*

*Lence* v. *Franklin*, 92 U. S. 343; *Deffeback* v. *Hawke*, 115 U. S. 407.)

IV.   The statute of limitations has no application to the title of a patentee of the United States anterior to the issuance of the patent.   (*Gibson* v. *Chouteau*, 13 Wall. 92; *Gardner* v. *Miller*, 47 Cal. 570.)   There can be no adverse possession as against the United States or its grantees, unless there be a new entry after the grant.   The individual making the original entry, after the grant by the United States, remains an intruder.   (*Cook, et al.*, v. *Foster*, 2 Gilm. Ill, 652; 1 Am. & Eng. Ency. of Law, 2d ed., 875; *Jutana* v. *Smith*, 95 Cal. 154–156–157; *Treadway* v. *Wilder*, 12 Nev. 108; *Gibson* v. *Chouteau*, 13 Wall. 92.)

V.   It is within the province of the land department to inquire into the character of these lands before certifying the same to the state, as to whether it was "unappropriated non-mineral public land," and the presumption is they did so, and, if determined by it to be of the character the state is entitled to select, this determination would be conclusive in the absence of fraud, imposition or mistake.   This determination cannot be attacked in a collateral proceeding.   The only way this certification can be set aside or annulled is by a direct proceeding instituted by the United States for some fraud practiced upon it, or on account of some mistake of fact or law occurring when the certification was made.   (*Carter* v. *Thompson*, 65 Fed. Rep. 329–31; *Barden* v. *R. R. Co.*, 154 U. S. 288; *U. S.* v. *William*, 30 Fed. 309; *Quimby* v. *Conlan*, 104 U. S. 426; *Green* v. *Hayes*, 70 Cal. 281; *Tubbs* v. *Wilhoit*, 73 Cal. 61; *French* v. *Fyan*, 93 U. S. 169; *Refining Co.* v. *Kemp*, 104 U. S. 636; *Steel* v. *Refining Co.*, 106 U. S. 447; *Sparks* v. *Pierce*, 115 U. S. 408; *Wright* v. *Roseberry*, 121 U. S. 488; *Standard Quicksilver Co.* v. *Habishaw*, 64 Pac.; *C. P. R. R. Co.* v. *McCann*, 58 Pac. Rep. 1045; 1 Dembitz on Land Titles, 503, 514–518; *U. S.* v. *Mullan*, 118 U. S. 271–6–7.)

VI.   When the selections are approved by the secretary of the interior, a list of them, with the certificate of the commissioner of the general land office, is forwarded to the state authorities.   The list thus certified operates to convey the title to the state as fully as by patent.   (Rev. Stats. U. S.

2449; *McCheery* v. *Haskell*, 119 U. S. 331; *Frasher* v. *O'Con-nor*, 115 U. S. 102–112–6; *Howell* v. *Slausen*, 83 Cal. 545; *Schieffery* v. *Tapis*, 68 Cal. 184–6.)

VII.  "The want of authority, which will make an instrument of this kind void, is a total want of authority to issue a patent for the subject of the grant; not a latent impropriety in exercising the authority by reason of unknown imposition, moving to its exercise when the proofs authorizing it are (or have been) formal and sufficient."  (*Kahn* v. *Old Tel. M. Co.* 11 Morrison Mg. Rep. 658.)  So also, according to the doctrine in the cases cited, if the patent be issued without authority, it may be collaterally impeached in a court of law.  "This exception is subject to the qualification that when the authority depends upon the existence of particular facts, or upon the performance of certain antecedent acts, and it is the duty of the land department to ascertain whether the facts existed, or acts have been performed, then its determination is as conclusive of the existence of the authority against any collateral attack, as is its determination upon any other matter properly submitted to its decision."  (11 Morrison Mg. Rep. 682; *Hoofnagle* v. *Anderson*, 7 Wheat. 212; *Boardman* v. *Lessees of Reed*, 6 Pet. 328; *Bagnell* v. *Broderick*, 13 Pet. 436; *Johnson* v. *Towsley*, 13 Wall. 72; *Moore* v. *Robbins*, 96 U. S. 550.)  The only method by which a patent, such as is involved in this case, can be attacked is by a direct action on behalf of the government of the United States to set it aside on the ground of some fraud, imposition or mistake.

*M. A. Murphy*, for Respondent:

I.  We claim that the title, as derived by Clopath from the State of Nevada, is absolutely null and void:  First—By reason of the fact that the land is not or was not unoccupied land, it having been in the possession of Springer and his grantors since the year 1864, about twenty acres of it being enclosed within the field of the said McGee and Mr. Springer; irrigating ditches being constructed upon it, and Mr. Springer cultivating from twelve to fifteen acres of the same.  Second—By reason of the fact that Clopath, not being a citizen of the United States, could not enter the land in his own

name, and, from the testimony of himself and Mr. Baird, it is plain to be seen that the agreement was entered by and between them for the purpose of entering property in violation of the United States and the state land laws. Third— That the land, being occupied, was not public land, and, by act of Congress of June 16, 1880, is excluded from the character of lands granted to the State of Nevada by said act.

II.    Section 3287, General Statutes of Nevada, reads: "An action may be brought by any person in possession, by himself or his tenant, of real property, against any person who claims an estate or interest therein adverse to him, for the purpose of determining such adverse claim, estate, or interest." Under statutes similar to the above, it has been held that: "A party may maintain an action to quiet title whether he be in or out of possession, and whether his title be legal or equitable." (*Foree* v. *Stubbs*, 41 Neb. 273; *Hall* v. *Hooper*, 47 Neb. 117; *Scorpion S. M. Co.* v. *Marsano*, 10 Nev. 379.) "One in possession of realty may sue another claiming an interest therein." (Pomeroy's Remedies and Remedial Rights, sec. 369; *Lovelady* v. *Burgess*, 52 Pac. 25; *Cook* v. *Forsyth*, 30 Cal. 662.) "The complaint need not state the source of plaintiff's or defendant's title." (*Curtis* v. *Sutter*, 15 Cal. 262; *Rough* v. *Simmons*, 65 Cal. 227; *Scorpion S. M. Co.* v. *Marsano*, 10 Nev. 379; *Golden Fleece G. & S. M. Co.* v. *Cable Consolidated G. & S. M. Co.*, 12 Nev. 321; *Rose* v. *Richmond M. Co.*, 17 Nev. 51.)

III.    Under the complaint in this action we can introduce evidence in rebuttal to impeach this patent, on the ground that the land was not of the character which the state was authorized to select from, by reason of the fact that it was not unoccupied public land, and, at the date of its selection, it was in the adverse possession of the plaintiff. (*Parley's Peak M. Co.* v. *Kerr*, 130 U. S. 260; *Ely* v. *New Mexico and Arizona R. R. Co.*, 129 U. S. 192; *Wall* v. *Magnes*, 17 Colo. 476; *Amter* v. *Conlon*, 22 Colo. 150; *People* v. *Center*, 66 Cal. 555; *Roy* v. *Duluth Iron Range R. Co.*, 69 Minn. 548; this case is affirmed in 173 U. S. 587; *Union M. & M. Co.* v. *Warren*, 82 Fed. 151.

IV.    The land embraced in the David A. Baird patent, and selected by the state, was known to be occupied, and not public land, by Baird and Clopath, at the date of such application

and selection. Under the terms of the grant to the State of Nevada, and by the express provisions of the above act, and not being of the character embraced by the granting act, and not intended to be granted thereby, its selection by the state and certification by the secretary of the interior, were null and void, and no right, title, claim or interest was conveyed thereby. (*Weeks* v. *Bridgman*, 159 U. S. 545; *English* v. *Leavenworth, Lawrence & Galveston R. R. Co.*, 23 Land Decisions, 343; *Stokes* v. *Pensacola and Georgia Railroad Co.*, 24 Land Decisions, 396; *Scott* v. *State of Nevada*, 26 Land Decisions, 629.)

V. A party in possession of public land, which he has under his dominion and control, but who had failed to preempt the same, cannot, after the expiration of the period within which he could have availed himself of his prior right of entry and purchase, be deprived of such land by a qualified homesteader making an entry thereon in accordance with the homestead law." (*Nichals* v. *Winn*, 17 Nev. 192.) And, as said in the opinion of Judge Sabin, in the case of *U. S.* v. *Williams*, 12 Saw. 147: "Under this state of facts, it cannot be contended, under the repeated decisions of both national and state courts, that this land was unappropriated, public land at the time of its selection by the state or at the date when it was listed to the state. If, then, the lands in controversy were not 'unappropriated public lands,' and within the terms of the grant at the date of the selection and listing to the state, as they were not, such listing was without authority of law, and was and is void, and no valid title passed thereby." This decision of Judge Sabin's was affirmed by the Supreme Court of the United States. (138 U. S. 514; *Whitney* v. *Taylor*, 45 Fed. 616; affirmed by the Supreme Court of the United States, 158 U. S. 88.) In the case of the *United States* v. *Handy*, 54 Fed. 447, Judge McKenna says: "The listing and certification of lands to the state is not conclusive upon a federal court as to the findings of fact implied by the approval of the land officers, but such court can set it aside for inadvertence or mistake." Therefore, we say here that Springer, being in the actual possession of the land described in his complaint at the date of the application of the said Baird was made and the selection of the same by

the State of Nevada, the state had no title to convey, and the patent is absolutely void; as the patent was inoperative to pass the title, objection to it can be taken at any time and in any form of action, and the plaintiff, though he has no title except naked possession, can question its validity. (*Cucamonga Fruit L. Co.* v. *Moir*, 83 Cal. 101.) The certifying of the lands to the state did not transfer the title, because the commissioner of the general land office had no authority to certify any lands to the state, except those to which the act of Congress applied, and it being occupied and exempt under the provisions of Section 2 of the act of June 16, 1880. The act of Congress of August 3, 1854, *supra*, declares that such listing of lands shall be perfectly null and void when the lands are not embraced in the acts of Congress. Where a sale of land by officers of the land department of the state is unauthorized, because the tract named in the patent is not of the class granted to the state by act of Congress, the patent is void and can be assailed from any quarter, and by parol evidence.

VI. The state has no right to make a selection of land that is in the adverse possession of another at the date of its selection; and, if the officers do act and make the selection, their acts are void, and a patent issued thereon is absolutely void. (*Polk* v. *Wendall*, 9 Cranch, 87; *New Orleans* v. *U. S.*, 10 Pet. 662, 730; *Wilcox* v. *Jackson*, 13 Pet. 498; *Stoddard* v. *Chambers*, 2 How. 284, 317; *Easton* v. *Salisbury*, 21 How. 426- 428; *Reichart* v. *Felps*, 6 Wall. 160; *Best* v. *Polk*, 18 Wall. 112, 117; *Leavenworth R. R.* v. *U. S.*, 92 U. S. 733; *Newhall* v. *Sanger*, 92 U. S. 761; *Sherman* v. *Buick*, 93 U. S. 209; *Steel* v. *Refining Co.*, 106 U. S. 447; *Railway Co.* v. *Dunmeyer*, 113 U. S. 629, 642; *Reynolds* v. *Mg. Co.*, 116 U. S. 687; *Edwards* v. *Rolley*, 96 Cal. 409; *Hermecilla* v. *Hubbell*, 89 Cal. 7; *Klauber* v. *Higgins*, 117 Cal. 456; *Garrard* v. *Silver Peak Mines*, 82 Fed. 578.)

## ON PETITION FOR REHEARING.

*M. A. Murphy*, for Petitioner (Respondent):

I. The opinion as rendered by this honorable court holds that the location as made by the grantors of Springer in the year 1862, and thereafter partially enclosed and cultivated by

Springer and his grantor, did not constitute an appropriation of the land under the definition as given to the word "appropriation" under the preemption laws of the United States, and cites as authorities the following cases: *McConnell* v. *Wilcox*, 1 Scam. 344; *Wilcox* v. *Jackson*, 12 Pet. 408; *Northern Pac. R. R. Co.* v. *Coburn*, 164 U. S. 383; *Kansas Pac. R. R.* v. *Dunmeyer*, 113 U. S. 620; *Hastings & Dakota R. R.* v. *Whitney*, 132 U. S. 357; *Whitney* v. *Taylor*, 158 U. S. 85; *Lansdale* v. *Daniels*, 100 U. S. 113, *Maddox* v. *Burnham*, 156 U. S. 544. We most respectfully submit that the case of *McConnell* v. *Wilcox*, reported in 1 Scammon, commencing at page 344, was correctly decided by the circuit court of Cook county, improperly reversed by the supreme court, and the correct principle established by the Supreme Court of the United States in the 13th Peters, at page 498.

II. There is quite a difference in the wording of the acts granting lands to the railroads, as the one granting lands under the 2,000,000-acre grant to the state. In the first it is, "or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached at the time the line of said road is definitely fixed." In the case of *Kansas Pacific Railroad* v. *Dunmeyer*, 113 U. S. 629, 644, Justice Miller, speaking for the court, said: "Of all the words in the English language, this word *attached* was probably the best that could have been used. It did not mean mere settlement, residence or cultivation of the land, but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation." In the act of Congress granting lands to the State of Nevada, the language used is: "The lands hereby granted shall be selected by the state authorities of said state from any unappropriated, non-mineral, public land in said state." For the definition of the word "attached," in land laws, see *Kansas Pacific R. R. Co.*, v. *Dunmeyer*, 113 U. S. 644; *Weeks* v. *Bridgman*, 41 Minn. 352.

III. The petitioner in this case wants to be distinctly understood as not claiming any vested right as against the United States, by the settlement and cultivation of the land

by his grantors and himself; but what he does claim is that, he being in the possession, improving and cultivating the same, the state could not, under the terms of the act granting land to the state, legally or rightfully select the same, because it was appropriated.

IV.   The statutes of this state recognize the right of a party to enter upon and take possession of the unsurveyed government land, and the courts of this state have always protected such settlement and possession, and, as between individual citizens, rights to the possession of the public lands have been recognized and protected by the courts of the territories and new states and of the United States, and acquiesced in by the government. (*Lamb* v. *Davenport*, 1 Saw. 620, 621.)

V.   We claim that, under the definition given to the word "appropriation" by all writers, the land in controversy was not unappropriated land; but was, and had been, appropriated and cultivated by Springer and his grantors for years prior to its selection by the state.

VI.   It is a well-settled principle that no right can be established by settlement and improvement on public land where the claimant forcibly intrudes upon the possession of one who had already settled upon, improved, and enclosed such land.   Such intrusion is but a naked unlawful trespass, and cannot initiate a right of preemption. (*Atherton* v. *Fowler*, 96 U. S. 513; *Tremouth* v. *San Francisco*, 100 U. S. 251; *Wirth* v. *Branson*, 98 U. S. 118; *Quimby* v. *Conlan*, 114 U. S. 420; *Mower* v. *Pletcher*, 116 U. S. 380; *Weeks* v. *White*, 41 Kan. 572.)

By the Court, BELKNAP, J.:

Action to quit title, brought under the provisions of Section 256 of the practice act (Section 3351, Comp. Laws.)

It appears from the statement on motion for new trial that plaintiff's predecessor in interest settled upon twenty acres of the land described in the complaint in the year 1862.   It was then unsurveyed public land.   He afterwards fenced it and cleared off a portion of it.   After his death his heirs transferred it to plaintiff, who has been in possession of it ever since.   He has not connected himself with the title of the

United States or of the State of Nevada, and claims to hold by possession and occupancy only.

In the year 1898 one David A. Baird made application to the proper officer to purchase the land from the State of Nevada, and upon June 17th of the same year made the first payment of $10 thereon. Thereafter, and upon final payment, a patent issued to Baird, from whom defendant deraigns title. The land was listed to the state under the act of Congress approved June 16, 1880, granting 2,000,000 acres of land from the unappropriated, non-mineral public lands in the state in lieu of the sixteenth and thirty-sixth sections.

Findings of fact in conformity with the above statement were made. As conclusions of law, the court decided that, at the date of Baird's application for purchase, plaintiff and his grantors had appropriated the land, and that its selecting and listing were without authority of law and void, and judgment was accordingly entered in favor of the plaintiff. The question is whether the conclusion of law is correct, that the land had been appropriated.

The term "appropriation," as used in the preemption laws, was defined by the Supreme Court of Illinois in the case of *Jackson* v. *Wilcox*, 1 Scam. 344. · That was an ejectment against an officer of the United States commanding a military post. Plaintiff's lessor claimed a preemption under the provisions of the act of Congress approved June 19, 1834 (4 Stats. at Large, 678.) That act revived a preemption law passed May 30, 1830, authorizing settlers or occupants to enter a certain quantity of land, subject to the restriction "that no entry or sale of any land shall be made under the provisions of the act, which shall have been reserved for the use of the United States, or either of the several states, or which is reserved from sale by act of Congress, or by order of the president, or which may have been appropriated for any purpose whatsoever." (4 Stats. at Large, 420.) Defendant, upon his part, insisted that the land had been appropriated for military purposes.

In its opinion the court say: "We take it for granted that there can be neither a reservation nor appropriation of the

public domain, for any purpose whatever, without the express authority of the law."

And later: "It is, in our judgment, entirely useless to discuss the precise meaning of the term 'appropriated,' in its general and extended sense, because its meaning and application in the manner it has been used in the preemption law cannot, we think, admit of a doubt. It means nothing more, in the sense in which it is used, than an application of the lands to some specific use or purpose by virtue of law, and not by any other power."

The case went to the Supreme Court of the United States. The judgment of the Illinois court was reversed upon the ground that certain acts of Congress which that court considered obsolete and inapplicable were determined by the supreme court to be pertinent and controlling.

In its opinion the court said: "We now return to the inquiry whether the land in question falls within any of the prohibitions contained in the act of Congress. Amongst others, lands, which may have been appropriated for any purpose whatsoever are exempt from liability to the right of preemption. Now, that the land in question has been appropriated in point of fact there can be no doubt; for the case agreed states that it has been used from the year 1804 until and after the institution of this suit, as well for the purpose of a military post as for that of an Indian agency, with some occasional interruption. Now, this is appropriation, for that is nothing more nor less than setting apart the thing for some particular use. But it is said that this appropriation must be made by authority of law. We think that the appropriation in this case was made by authority of law.

"As far back as the year 1798 (see act of May 3d of that year, vol. 3, Laws U. S. 46) an appropriation was made for the purpose, amongst other things, of enabling the president of the United States to erect fortifications in such place or places as the public safety should, in his opinion, require. By the act of 21st of April, 1806 (vol. 4, Laws U. S. 64), the president was authorized to establish trading houses at such posts and places on the frontiers or in the Indian country on either or both sides of the Mississippi river as he should

judge most convenient for carrying on trade with the Indians. And by act of June 14, 1809, he was authorized to erect such fortifications as might, in his opinion, be necessary for the protection of the northern and western frontiers.

"We thus see that the establishing trading houses with the Indian tribes and the erection of fortifications in the West are purposes authorized by law, and that they were to be established and erected by the president. But the place in question is one at which a trading house has been established, and a fortification or military post erected.

"It would not be doubted, we suppose, by any one, that if Congress had by law directed the trading house to be established and the military post erected at Fort Dearborn, by name, that this would have been by authority of law. But instead of designating the place themselves, they left it to the discretion of the president, which is precisely the same thing in effect.

"Here, then, is an appropriation, not only for one but for two purposes, of the same place, by authority of law. But there has been a third appropriation in this case by authority of law. Congress, by law, authorized the erection of a light-house at the mouth of Chicago river, which is within the limits of the land in question, and appropriated $5,000 for its erection; and the case agreed states that the lighthouse was built on part of the land in dispute before the 1st of May, 1834. We think, then, that there has been an appropriation, not only in fact, but in law." (*Wilcox* v. *Jackson*, 13 Pet. 498.)

The definition given to the word "appropriated" as used in the act of Congress of 1830, is the opposite of the meaning of the word "unappropriated" as it appears in act of June 16, 1880. The word "unappropriated," as used in the latter act, means unappropriated by any law of Congress.

Again, a settler upon a tract of public land, occupying and cultivating it, but without entry in the land office, acquires no rights against a government grantee.

In *Railroad Co.* v. *Colburn*, 164 U. S. 383, one Kelly settled upon the land. The state court held that his cultivation and occupation created a claim which he could have perfected

under the public land laws, and therefore excepted the land from the company's grant.

The court said: "If it be true, as matter of law, that mere occupation or cultivation of the premises at the time of the filing of the map of definite location, unaccompanied by any filing of a claim in the land office then or thereafter, excludes the tract from the operation of the land grant, the decision of the Supreme Court of Montana was right. But frequent decisions of this court have been to the effect that no preemption or homestead claim attaches to a tract until an entry in the local land office. Thus, in the case of *Railroad Co.* v. *Dunmeyer*, 113 U. S. 629, 644, Mr. Justice Miller, speaking for the court, said: 'Of all the words in the English language, this word "attached" was probably the best that could have been used. It did not mean mere settlement, residence, or cultivation of the land, but it meant a proceeding in the proper land office by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation.' This language was quoted and the decision reaffirmed in *Railroad Co.* v. *Whitney*, 132 U. S. 357; *Whitney* v. *Taylor*, 158 U. S. 85.

"In *Lansdale* v. *Daniels*, 100 U. S. 113, 116, it was ruled that 'such a notice of claim or declaratory statement is indispensably necessary to give the claimant any standing as a preemptor, the rule being that his settlement alone is not sufficient for that purpose.' See, also, *Maddox* v. *Burnham*, 156 U. S. 544. Now in this case the allegations are that Kelly never made any entry in the local land office, and the decision of the secretary of the interior is based simply on the fact of occupation and cultivation. And, while the decision of that fact may be conclusive between the parties, his ruling that such occupation and cultivation created a claim exempting the land from the operation of the land grant is a decision on a matter of law which does not conclude the parties, and which is open to review in the courts. * * * For the reasons above indicated, because the decision of the land department was only on matters of fact, and

did not conclude the law of the case, and because such facts so found were not of themselves sufficient to disturb the title of the railroad company, the judgment is reversed," etc.

The judgment of the district court in this case is reversed, and cause remanded, with instructions to enter judgment in favor of appellant, with costs.

Rehearing denied.